# CONSULTING PROJECT

---
### PRESENTENCE MEMORANDUM
---

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

ISAIAH DUKES
Docket No. 24 Cr-00028

HONORABLE JUDGE NINA R. MORRISON

AUSA REBECCAM. SCHUMAN
AUSA GILBERT REIN

Respectfully submitted,

Mandi Budah, MA, LCSW
Forensic Social Work Consultant

Reynaldo Cusicanqui, BA
Forensic Mitigation Specialist
CONSULTING PROJECT

Dawn M. Florio, Esq.
488 Madison Avenue, 20th Floor
New York, NY 10022
DEFENSE COUNSEL

October 24, 2024

# CONTENTS

INTRODUCTION………………………………………..……………………....................Pg. 3

BIOPSYCHOSOCIAL HISTORY…………………………………...…………………….Pg. 6

EDUCATION AND EMPLOYMENT HISTORY………………………………………..Pg. 9

LEGAL HISTORY AND EXPERIENCE DURING CONFINEMENT...…………………..Pg. 10

MEDICAL AND PHYSICAL HEALTH HISTORY……………………………………...Pg. 12

ALCOHOL AND SUBSTANCE USE HISTORY……………………………………….Pg. 12

MENTAL HEALTH HISTORY………………………………………………………….Pg. 12

COLLATERAL INTERVIEW WITH KHIELL DUKES…..……………………………Pg. 13

COLLATERAL INTERVIEW WITH DAMITA MILTON…………………………………Pg.14

COLLATERAL INTERVIEW WITH JANELL JACKSON………………………………Pg. 16

CLINICAL CONCLUSIONS…..……………………………………………………......Pg. 17

RELEVANT RESEARCH SUPPORTING CLINICAL FACTORS………………………Pg. 19

RECOMMENDATIONS………………………..……….......…………………….....................Pg. 22

Character Reference Letters

1. Janell Jackson- Mother of Youngest Child
2. Hattie Milton-Maternal Grandmother
3. Gloria Oliver-Maternal Aunt
4. Traci Milton-Cousin
5. Dexter Dale-Friend and "fellow entertainer"
6. Billy Deal-President of Perfect Vision Empowered
7. Travis Marsh-Music Producer
8. Lea Marsh-Music Manager
9. Ezra Carey-Friend
10. Willard Magee III- Music Producer
11. Andrew Krents-Transactional Attorney
12. Davontae Hammock-Friend

**INTRODUCTION**

This presentence memorandum has been prepared by the Consulting Project, a private mitigation and forensic social work firm that assists defense attorneys with evaluations of individual clients and cases with a view toward presenting alternative pleas and sentencing possibilities to the Court and the United States Attorney's Office. This memorandum is submitted by Reynaldo Cusicanqui and Mandi Budah, MA, LCSW on behalf of Isaiah Dukes, at the request of his attorney, Dawn M. Florio.

Mr. Cusicanqui has worked as a Forensic Mitigation Specialist and Sentencing Advocate since 1995. Due to his lengthy experience, he has knowledge of psychosocial contributors and extensive knowledge of criminal behavior derived from evaluating thousands of defendants in the state and federal court systems. He has also gained most of his forensic experience in mitigation from being appointed as a Senior Mitigation Specialist on numerous death penalty eligible matters in the United States District Court for the Southern and Eastern Districts of New York.

I, Mandi Budah have worked as a Licensed Clinical Social Worker since 2012 and additionally possess a master's degree in forensic psychology, obtained in 2010. A degree in forensic psychology specializes in the application of clinical skills including assessment, treatment, and evaluation to forensic settings. Following psychological assessment of an offender, I am able to apply tools, research and ideas from psychology to legal situations and to help answer legal questions. With a forensic psychology background, I am able to provide psychological expertise and research to help legal professionals and proceedings better understand human behavior and the effects of trauma or other life events. With my knowledge of psychosocial contributors and comprehensive knowledge of criminal behavior obtained from working with the Consulting Project, I conduct evaluations, prepare Pre-pleading and Pre-sentence reports for the court, and recommend necessary sentencing alternatives on criminal matters. It is our specialty to

3

provide the greatest amount of psychosocial background to the decision-making parties. This ultimately allows us to identify the appropriate classification of a defendant that is a risk to the community or a defendant that is deserving of a just and appropriate disposition.

The information in this report is based on multiple interviews with Mr. Dukes, who is presently incarcerated at the Metropolitan Detention Center. Collateral interviews were conducted with his mother, Damita Milton, father, Khiell Dukes and the mother of his child, Janell Jackson. During his clinical assessment, Mr. Dukes presented a history of growing up in violence infested neighborhoods, without influence from his father, or stable male role models. The males in his life all have a documented history of arrest and incarceration, leaving Mr. Dukes to seek outside guidance and support, namely from negative peers and television and music influences. This impacted his adolescent stages, a primary stage in human development and emotion regulation and compromised his ability to demonstrate behavioral inhibition and restraint. These experiences additionally may have precipitated unbalanced emotional states and compromised judgment, global reasoning, decision-making and problem-solving skills in adult stages.

In presenting this memorandum, we wish to highlight Mr. Duke's relevant biopsychosocial history and specific mitigating factors that we believe should be considered at the time of sentencing. We respectfully recommend a period of incarceration no greater than necessary and an opportunity to participate in therapeutic services once released back into the community. A disposition that will afford him the opportunity to clinically evaluate his past and to develop additional skills needed for community reintegration, success in his career, and the ability to build upon his insight, judgement, and coping skills. As well as an ability to increase his understanding into the stressors impacting his decision-making and problem-solving skills, and reduce his risk for recidivism.

4

The mitigating factors we have identified are as follows:

- Mr. Dukes was raised primarily by female heads of households, lacking paternal involvement, from age 2, due to a fragmented family structure, therefore lacking support or guidance from any male role models; most male family members have a history of criminal involvement and incarceration. This compromised social and emotional development and impacted identity formation during critical developmental stages.

- The neighborhoods in which Mr. Dukes grew up in are characterized by marked violence and drug use, exposing him as a witness to violence from a young age. Being a witness of community violence predisposed him to delinquency and criminal activity in juvenile and adolescent stages.

- Mr. Dukes has been involved in the criminal justice system since adolescence, where he experienced a period of solitary confinement, significantly impacting his emotional maturity. He was ill-equipped to navigate the demands of adulthood and emotionally underdeveloped to cope with the pressure and stress upon his re-integration into the community.

- Utilization of negative peer influences for guidance and direction, due to the absence of male role models during critical developmental periods negatively impacted decision-making and problem-solving skills complication in adult stages.

- Mr. Dukes is open to participating in clinical and therapeutic service to address his abnormal and delinquent conduct once released back into the community.

- There is no history of diagnosable mental illness.

- Mr. Dukes has a history of documented community service, as he is a professional rapper under the name *"Lil Zay Osama."*

- Mr. Dukes is characterized by those closest to him as a man of good character who possesses a giving nature. Appended herein are letters that show that there is a documented contribution to his family and community.

**BIOPSYCHOSOCIAL HISTORY**

Mr. Isaiah Gebar Dukes was born without complication on June 3, 1997, at the Michael Reese Hospital in Chicago, Illinois, to the consensual union of Damita Milton (49) and Khiell Dukes (50). He reported his mother resides in Chicago, Illinois, previously worked for the United States Postal Service, presently does not work, is financially supported by him and suffers from an eye disease that is causing her to lose her vision. His father also lives in Chicago, is employed as Mr. Dukes' road manager. Both of his parents are in good health. He has five siblings: Daijarne Dukes (34), lives with her mother and works in a nursing home as a nursing assistant; Brittany Dukes (33) lives with her children, is not presently working and is financially supported by Mr. Dukes; Khiell Dukes Jr. (30) is presently incarcerated for armed robbery and is due to be released in November 2024 and has a history of multiple incarcerations since adolescence. Ashanti Ramsey (22) is Mr. Dukes' half-sister who resides with their mother, is presently in school, and is employed at UPS; and Anthony Ramsey (20) is Mr. Dukes' half-brother who is presently incarcerated for a violation of parole for an original gun charge. He has five children who are all financially supported by Mr. Dukes.

Mr. Dukes recalled being raised by his mother, his aunt, Kamita Milton, and grandmother, Hattie Milton (70). He reported growing up in the Robert Taylor Homes public housing complex, located in South Chicago, Illinois, which was plagued by gun violence, where his parents were

6

separated, when he was 2 years old and his father did not reside in the apartment with him; from the ages of 6-19 his father resided in Iowa with his longtime girlfriend Nicky, and reportedly was in an out of jail during Mr. Dukes' childhood and adolescence.

During childhood, Mr. Dukes reported his mother worked for the post office and he and his siblings were often left home alone. On one occasion, Mr. Dukes and his siblings were "throwing rocks at cars" and the police were called. Ms. Milton left work without permission to deal with the situation and subsequently lost her job; she did not return to work and relied on public assistance.

Also, during childhood, Mr. Dukes reported moving approximately 7-8 times, always to escape the violence of his communities. He reported spending a lot of time in the Robert Taylor Homes, in the Bronzeville neighborhood on the South Side of Chicago, that was full of "gangsters and drug dealers," where everyone was "hustling" and "everyday [he] was approached by them."[1] He recalled when he was 8 years of age, he witnessed a murder and "saw a dead body" after hearing shots fired in his complex. After that, he recalled witnessing "a lot of violence" including shootings and stabbings. He reported when he was 12 years of age, he witnessed the shooting and murder of his friend "Tae," who was 19 when he was killed by a gang member. He described being "threatened" by gangs regularly in Chicago, explaining "guns were everywhere." He recalled when he was 13 years old, his brother was shot in the neighborhood. When Mr. Dukes was 15 years of age, he himself suffered a gunshot wound by gang members to the right side of his chest. When his oldest sister was 16 years of age, she was sexually assaulted, and later her assailant was arrested

---

[1] https://southsideweekly.com/growing-up-in-the-robert-taylor-housing-projects

and sentenced to 20-30 years. The complex was subsequently demolished in 2005 due to increasing danger and violence.[2]

In the home, Mr. Dukes maintained a close relationship with all his siblings and denied all instances of abuse or violence. He reported living with his brother and sisters and only experienced violence when they left the family home. Mr. Dukes reported at one point, his mother's boyfriend, Antwone lived in the home. He suffered from diabetes and required a wheelchair as he was an amputee. Mr. Dukes maintained and still maintains a good relationship with him and reported he was never verbally or physically abusive.

During early adolescence, Mr. Dukes reported most of his male role models were in and out of jail and found himself becoming involved in and connecting to the music industry, where he took to rap and began honing his craft. He expressed looking up to people on television, including rappers and those in the music industry. At the age of 15, he was arrested with older friends from the neighborhood and was placed in a youth facility in Chicago. Following his release, Mr. Dukes was signed by Warner Records. He was managed by "SB," who helped him understand the music business. Prior to being signed by Warner Records, Mr. Dukes engaged in odd jobs including snow removal and landscaping.

Mr. Dukes described his early music as containing lyrics about "the things he used to do," including the traumatic experiences and shootings he endured. Now, he writes music that speaks

---

[2] The Robert Taylor Homes faced many of the same problems that doomed other high-rise housing projects in Chicago, including drug dealing, drug abuse, gang violence, and the perpetuation of poverty. Planned for 11,000 people, the complex housed 27,000 individuals, where at one point, 95% of the complex was unemployed and relied on public assistance as their only source of income, and 40% of households were single-parent, female-headed households earning less than $5,000 per year. Neglect was evident in littered streets, poorly enforced building codes, and scant amenities. Police officers often felt unsafe and were frequently shot at. A majority of residents either had a family member in prison or expected to return from prison in two years, according to surveys. Gangs dominated the housing complex and $45,000 in drug deals took place daily. Most crimes that were committed were drug and street gang related. The Chicago Housing Authority moved out all residents by the end of 2005 and in March 2007, the last remaining building was demolished.

about taking care of family and "staying out of the streets." He has utilized his experiences to change his mindset and his outlook. He has additionally participated in community service including toy and turkey drives and back to school events, and he has financially assisted people who are incarcerated. In a letter from Perfect Vision Empowered, Billy Deal states that Mr. Dukes "has been influential in assisting our org(anization) with participants as well as contributing multiple hours weekly feeding and showering the community with gifts during toy drives."

Mr. Dukes has gained insight into his youth and has worked diligently to turn his life around and improve his morals and character. He maintains short and long-term goals but feels as though others have "put him in a trap" and when on a good path, "have turned on [him].

Mr. Dukes is presently under the management of Leah Marsh and has hopes to be able to move to Santa Rosa Valley in California, to provide a better life for his girlfriend and three children, Baby Zay (6), Zuri (5) and Llejan (4). The mother of his eldest two is Kimberly, whom Mr. Dukes does not maintain a good relationship with. Jannell Jackson is the mother to Llejan. She has been with Mr. Dukes for 7 years and they reside together in Chicago, Illinois.

**EDUCATIONAL AND EMPLOYMENT HISTORY**

Mr. Dukes attended several schools during childhood as a result of residential instability and many residential moves. He attended elementary school at McCorkle Elementary School from Kindergarten through the 2nd grade, before moving. He attended the Ludwig Van Beethoven Elementary School from 3rd through 6th grade, the Earl School for 7th grade and the Marquette School of Excellence for 8th grade. He began high school at the Bogan Computer Technical High School but was arrested in the 10th grade. He went to a juvenile facility, where he obtained his high school diploma while in detention in the Illinois Youth Center. He described it was difficult to

maintain friendships and lost connections each time he relocated with his family. He was always able to make friends in new schools but found it hard to maintain friends when he moved. Mr. Dukes reported he was always a good student, maintained good grades and was in regular education classes. He denied disciplinary issues during his educational career but at times was asked to leave class due to being a "jokester." He reported having positive experiences in all schools except high school, which was riddled with gang activity, something he never became involved in. He expressed experiencing pressure to join a gang and had many friends who were in gangs, but he never joined himself.

Mr. Dukes has never maintained full-time employment. When he was 11 years of age, he shoveled snow and cut the grass of neighbors to earn a small income. As soon as he was old enough to take the train, he obtained miscellaneous jobs. As an adolescent, he was supported by his mother, aunt, and older sister. Mr. Dukes began rapping at the age of 8 and by the time he was 12 years of age, he was posting videos to YouTube, earning $100-200 per video.

## LEGAL HISTORY AND EXPERIENCE DURING CONFINEMENT

Mr. Dukes was arrested at the age of 16, he was charged with robbery and sentenced to a term of one year of incarceration in a juvenile facility and then at 17 years old was arrested for similar charges and sentenced to three years in a juvenile facility.

Mr. Dukes was detained in an adolescent facility for over three years. He explained he witnessed significant violence and was assaulted by other inmates. He reported he endured solitary confinement on many occasions, ranging in length from 2 weeks to 30 days. Solitary confinement (SC) generally refers to placement in restricted housing for upward of 22–23 hours per day, with heightened cell restrictions and security procedures. Apart from some exceptions, social contact with correctional staff and other inmates is essentially eliminated. Inmates in SC are therefore

accorded very little access to education, vocational training, visitation, recreation, and additional services that are available to the general inmate population. Proponents of SC argue that the practice is necessary to maintain safety, order, improve behavior, and reduce gang influence. However, there is a shortage of empirical evidence demonstrating these accomplishments and studies have shown that SC fails to reduce misconduct, is associated with increased recidivism, and has adverse effects which outlive incarceration, namely deleterious psychological effects. Not only does this setting affect inmates with existing mental health needs but may bring forth new psychiatric symptoms and disorders.[3]

The rigid conditions of solitary confinement offer individuals no opportunity to engage in social reality testing. A complete lack of social contact makes it difficult to distinguish what is real from what is not or what is external from what is internal. Ultimately, social connectedness and social support are the prerequisites to long-term social adjustment, which is impeded during solitary confinement and long-term social isolation leads to social withdrawal.[4] Inmates housed under conditions of confinement rely on the prison structure to limit and control their behavior. A consequence of this is that convicts are no longer able to manage their conduct when returned to the general prison population or when released to the community. They may be unable to initiate behavior due to apathy and may resort to acting-out behaviors to test their environment. Inmates who have been confined in special housing units experience intolerable feelings of frustration, anger, and rage. The social isolation of solitary confinement additionally increases an inmate's risk for depression, long-term impulse-control disorder, psychosis, and suicidal behavior, few of which are applicable to Mr. Dukes. Due to the physical conditions of solitary confinement

---

[3] Luigi, M., Dellazizzo, L., Giguere, C.E., Goulet, M.H., & Dumais, A. (2020). Shedding light on "the hole": A systematic review and meta-analysis on adverse psychological effects and mortality following solitary confinement in correctional settings. *Frontiers in Psychiatry,* 11, article 840.

[4] Arrigo, B.A. & Bullock, J.L. (2008). The psychological effects of solitary confinement on prisoners in supermax units. International Journal of Offender Therapy and Comparative Criminology, 52(6), 622-640.

including lack of personal materials, sensory deprivation, and size of cell, prisoners are at increased risk of suffering perceptual changes, affective disturbance, difficulty with thinking, concentration, and memory, disturbance of thought content, and problems with impulse control.[5]  It is evident that Mr. Dukes' history of confinement impaired later decision-making and impulse control, resulting in additional antisocial and criminal behavior as an adult.

## MEDICAL AND PHYSICAL HEALTH HISTORY

Mr. Dukes denied a significant medical history of illness or disease. He was hospitalized for a gunshot wound at the age of 14 and has been involved in three car accidents; on one occasion he was rear ended and on two occasions another driver ran a red light. He did not sustain any head injury or significant injury.

## ALCOHOL AND SUBSTANCE USE HISTORY

Mr. Dukes reported a minimal substance use history, noting he has tried marijuana at the age of 13. He consumes alcohol occasionally, at social events and parties, does not drink alone, and has no history of blackouts. There is no history of substance use treatment, and there is no family history of substance use or addiction.

## MENTAL HEALTH HISTORY

Mr. Dukes denied a history of diagnosed mental illness, prescription for psychotropic medications, hospitalization, or engagement in mental health counseling services. He endured a period of depressed mood following the death of his friend during pre-adolescence, explaining he

---

[5] Arrigo, B.A. & Bullock, J.L. (2008). The psychological effects of solitary confinement on prisoners in supermax units. International Journal of Offender Therapy and Comparative Criminology, 52(*6*), 622-640.

was sad and cried "for days." He additionally reported depressed mood throughout his childhood as a result of losing friends and social connections each time he and his family moved. Despite never being formally diagnosed, Mr. Dukes reported he believes he suffers from anxiety and experiences tightness in his chest and shortness of breath. He has additionally gone to the hospital on more than 10 occasions for anxiety. He has never been diagnosed with an anxiety disorder and has never been prescribed medication. Mr. Dukes has expressed interest in participating in mental health counseling sessions. It is recommended that Mr. Dukes obtains a psychiatric evaluation.

**COLLATERAL INTERVIEW WITH KHIELL DUKES**

Mr. Khiell Dukes is the father to Mr. Dukes. During his collateral interview, he reported he was born and raised in Chicago, Illinois and met his son's mother in the neighborhood when they were children. They began dating when she was 16 years of age and lived together for approximately 6 years, until Mr. Dukes was 2 years of age. Khiell Dukes reported he worked for the Board of Trade Arbitration Clerks off and on from 1995 through 2001. He described he has always maintained work and for the past five years has been working with his son as his road manager. He reportedly will be taking a break from road managing and is due to begin employment as a maintenance technician.

Khiell Dukes disclosed his own involvement with the criminal justice system when he was an adolescent, expressing he spent time at a juvenile "boot camp" from 1994-1995. From 2003 through 2019 (when Mr. Dukes was 6-22 years of age), he relocated to Iowa, where he admitted he was not present in his son's life, outside of Mr. Dukes coming to visit him. He admitted to being involved in a toxic relationship that resulted in an arrest for "domestic issues" and a violation for "a no contact order." In approximately 2017, Khiell Dukes was sentenced to two years'

incarceration for an aggravated misdemeanor. He reported while living in Iowa, a maternal cousin, Melvin Oliver, a Chicago Police Officer, helped care for Mr. Dukes. Mr. Dukes stated that Mr. Oliver "tried to be a father figure".

Khiell Dukes reported his son was approximately 12-13 years of age when he first got in trouble with the law, correlating to a time when he also started taking his music career seriously. Khiell Dukes expressed he was upset when he learned his son was sentenced to time in a juvenile facility, stating, "he was a good kid back then. The crowd he hung around with was not good."

Khiell Dukes described his son as intellectual, friendly and outgoing, someone who is very loyal to his friends, despite them being a negative influence on him. He expressed once his son is released, he intends to be present in his life, and serve as a positive influence. He reported his son has a strong foundation in Los Angeles, California.


**COLLATERAL INTERVIEW WITH DAMITA MILTON**

Damita Milton is Mr. Dukes' mother. She is 49 years old. Her health is somewhat fragile, specifically her eye sight which is poor and her lungs are 'weak". She is under doctors care for COPD and uses eye drops for her eyes. She was born in Chicago and presently lives alone with her youngest daughter, Ashanti Ramsey. She stated that their residence is temporary since they are seeking to purchase a home soon, with Mr. Dukes assistance. She has a large immediate family, which consists of one sister and four brothers. Although she had a large family they had limited involvement in Mr. Dukes' childhood, since all of her family "lived far from us". They are now presently involved and have expressed concern for the outcome of the present legal situation Mr. Dukes finds himself in.

Ms. Milton noted that as a child Mr. Dukes was close to his maternal cousins, who later had families and moved out of the neighborhood. It was around this time that Mr. Dukes who was about age 8-9 commenced an interest in rapping. He would watch rap videos after school. Although he did well in school he was fascinated with rap. His mother said she found his fascination to be "good because it kept him home". He had many friends from school but would seldom go out of the house after school. She was happy about this since the neighborhood they were raised in "was no good." When Mr. Dukes was born they lived in the projects. Ms. Milton was the second generation that resided in public housing. She recalled the neighborhood being plagued with violence and "drug dealing." She witnessed shootings, fights and drug sales. She wanted to leave the projects so she could "save" her children. They subsequently moved, with the assistance of Section 8, when Mr. Dukes was about 15 years old. They found a new residence close by. Their new residence was a four bedroom house which, although safer, was not far from the projects, therefore the shootings continued. It was then when Mr. Dukes' friend was shot and killed. Many others, which were also adolescents, were shot and injured. Mr. Dukes was also shot by gang members when he was 14 years old.

Ms. Milton recalled that Mr. Dukes commenced getting into trouble around the age of 12-16. She felt that he was "hanging around the wrong people, who were involved in crime". While in juvenile detention Mr. Dukes commenced his practice of rapping. He made rapping his profession at the young age of 19 when he was formally signed by Warner Brothers record label.

Although she stated that she does not really know details of the present case, she believes her son is "not a bad person" and it has been a "wake up call" for him. She emphasized that he has taken care of her financially since early in his career. She spoke of his devotion to his family, stating that he is a "great father to his three children" and when they "call him, he is always there

for them". He also reportedly does the same for close friends. She said he "has a very big heart" and "is a giving person," but emphasized that he has too many friends that he takes care of mostly financially. The friends he is mostly close to are "from the old neighborhood," but she emphasized that "those are the ones he needs to stay away from."

Ms. Milton remains committed to being there for her son. She understands and supports his interest in moving from Chicago and going to California. Although he has few family members there she believes that he has the right support network among his professional acquaintances.

**COLLATERAL INTERVIEW WITH JANELL JACKSON**

Janell Jackson is 28 years old and is the mother of Mr. Dukes' daughter Lle'Jan E. Dukes. She has known Mr. Dukes since she was 12-13 years old, they resided in the same neighborhood and attended the same school. She spent time with him a lot but did not have any formal relationship with him at the time. They maintained contact until high school, which was when she went to a different school, hence she lost contact with him. She heard him on the radio and then "looked him up," when she was about 18 years old. They reunited when she was 20 years old and started dating when she was 21-22. She saw that Mr. Dukes had "matured." The couple moved in together in October 2019 and in 2020 their daughter, Lle'Jan was born. Ms. Jackson emphasized that Mr. Dukes is a "great father to Lle'Jan" and was very active in his children's lives, including taking them to the park and water park and also to Disneyland. She said that Mr. Dukes "grew up" and matured as a father.

In a letter appended herein, Ms. Jackson provides a great amount of detail of her life with Mr. Dukes and his struggles in the neighborhood they resided in, as well as his success.

Ms. Jackson recalled living in the same violent community as Mr. Dukes, emphasizing that "he (Mr. Dukes) has seen a lot of violence in his life." Their community was low income, with lots of gun violence, which caused the death of many of their friends, who at times were just innocent bystanders. She added that Mr. Dukes was influenced by his surroundings, however he never used or was addicted to any illegal substances or alcohol. She recalled Mr. Dukes being in trouble as a juvenile, trying to "adapt" to his surroundings. He however did manage to get his high school diploma while he was in detention as an adolescent. She stated that his detention changed his life. He was self-reliant, specifically since he had "no one to put money in his commissary, so he worked at the jail". She added that it was there, at the detention center where he commenced his career as a rapper.

Ms. Jackson noted that Mr. Dukes always had positive qualities, stating that he takes care of his entire family, specifically his mother who is "legally blind". He also takes care of his siblings and his grandmother, who rely on him for financial stability. In addition, he tries to help others like the friends he has who are from his old neighborhood, but almost "to a fault". He is "very caring", but sometimes he "is taken advantage of" by his "so called friends". She commented on the incident that led to his present case as a time when he was exposed to his negative friends, emphasizing that "if I was there this would have not happened". According to her he never acted out and was normally with her and his own security, except on the day of the incident when she decided to return to Chicago and he had sent his security home early.

**CLINICAL CONCLUSIONS**

It is with conviction that we believe Mr. Dukes is suffering from the early implications of growing up without influence from his father or positive influence from other male role models

and being exposed to community violence since childhood. From a young age, Mr. Dukes sought out support and guidance from negative peer influences and from rappers, music influences, and television stars that he "looked up to." He lacked healthy attachment to and consistent influence from his father, and many other male family members, most of whom had a history of arrest and incarceration. These early developmental experiences formed the foundation for his social, emotional, and psychological processing and functioning and has negatively impacted his ability to cope, solve problems, and effectively make decisions as an adult. His early experiences resulted in underdeveloped cognitive skills and functioning, social and emotional immaturity, and lack of insight and understanding into decision-making and coping as an adult.

As Mr. Dukes began progressing through early adolescence, he had already identified his interest in music and was seeking guidance and support from older individuals who lacked positive qualities needed for successful development, which set the foundation and heavily influenced his behavioral challenges and criminal involvement as a juvenile and then as an adult. His experiences have directly influenced his social and emotional adolescent development which has led to alterations in brain structure and function, negatively impacting decision making, problem-solving, and coping with situational stressors as an adult.

Despite his challenging upbringing, Mr. Dukes has managed to create a successful career as an American rapper, *Lil Zay Osama*. He utilized his time in juvenile detention to increase insight and awareness into his behaviors and actions, determined to create a better life for himself. Upon release in 2017, he began releasing music with a new perspective, was signed by Warner Music, and has been contracted for three albums, two of which he has completed. He is the sole financial provider for several family members and an extended period of incarceration will greatly reduce his ability to provide for his family, in addition to his own children and nuclear family.

**RELEVANT RESEARCH SUPPORTING CLINICAL FACTORS**

Mr. Isaiah Dukes is a 27-year-old successful rapper who comes from a family with significant involvement in the criminal justice system. His father, uncles, and siblings all have arrest records and histories of incarceration. He was raised primarily by women and lacked positive male role models throughout his upbringing and was exposed to community violence from a young age. Despite these challenges, he has achieved considerable success in the music industry, which demonstrates his resilience and ability to navigate certain aspects of his environment. However, he continues to face legal issues, suggesting that the negative influences of his upbringing have not been entirely overcome and demonstrates the complex interplay of biopsychosocial, developmental, and environmental factors and how they have shaped his path.

Exposure to community violence has been designated a public health epidemic for adolescents residing in economically-disadvantaged urban neighborhoods. Exposure to community violence has been linked with several maladaptive biopsychosocial outcomes for male adolescents in urban communities, and a burgeoning body of research examines desensitization as an outcome of community violence exposure. Desensitization to exposure to community violence posits that youth who experience repeated exposure to violence "adapt" by suppressing emotional distress and viewing violence as normal. However, when youth become emotionally numb and normalize violence, they may lose inhibitions about using aggressive behavior, which may lead to violence perpetration and additional violence exposure,[6] as in the case of Mr. Dukes. Witnessing violence in the community environment also predisposes children and adolescents to both violent and nonviolent types of offenses during adolescence as well as association with other violent

---

[6] Gaylord-Harden, N. So, S., Bai, G. & Tolan, P. (2017). Examining the effects of emotional and cognitive desensitization to community violence exposure in male adolescents of color. *American Journal of Orthopsychiatry,* 8(4), 463-473.

individuals.[7] Empirical research supports an association between children's exposure to community violence and delinquency.[8] Children who frequently witnessed violence in their neighborhoods are likely to engage in delinquency and participate in criminal activities, such as assaultive behavior and weapon-carrying, during adolescence and adulthood.[9] Social learning theorists assert that children learn behaviors through observation, role modeling, and reinforcement in their immediate environments, including home, school, and the neighborhood.[10] In turn, they learn to accept violence and delinquency as expected and conventional, participating in criminal activity without contemplation, ultimately leading to the potential development of internalizing and externalizing behaviors and disorders.[11] Mr. Dukes was never afforded the opportunity for observation, role modeling or reinforcement from his parents, his father specifically, and looked to his neighborhood peers for guidance.

Mr. Dukes grew up in an environment where criminal behavior was normalized, as the majority of the male figures in his family were involved in the criminal justice system. Research suggests that children with family members who have been incarcerated are at a greater risk of developing antisocial behavior, mental health issues, and criminal justice involvement.[12] This intergenerational transmission of criminal behavior can create a sense of inevitability about following the same path. For Mr. Dukes, his family's criminal history likely shaped his view of the world, where crime and incarceration were expected parts of life, diminishing the deterrent effect of legal consequences.

---

[7] Hong J, Huang H, Golden M, Upton Patton D, Washington T. Are Community Violence-Exposed Youth at Risk of Engaging in Delinquent Behavior? A Review and Implications for Residential Treatment Research and Practice. *Residential Treatment for Children & Youth* [serial online]. October 2014;31(4):266-283.
[8] Ibid.
[9] Ibid.
[10] Ibid.
[11] Ibid.
[12] Murray, J., Farrington, D. P., & Sekol, I. (2012). Children's antisocial behavior, mental health, drug use, and educational performance after parental incarceration: A systematic review and meta-analysis. *Psychological Bulletin*, 138(2), 175-210.

Mr. Dukes was raised primarily by women from the age of 2, without the presence of a consistent male role model. Father-child interactions are not only critical during the first few years of development but are primarily responsible for shaping children's adaptive socio-emotional development.[13] Father absence is a contributing factor to the poorer well-being of children and related to decreased cognitive ability and development, poor social adjustment and increased risk in delinquency.[14] The absence of a father relationship additionally impacts an adolescent's ability to make sound decisions, as in the case of Mr. Dukes, as well as triggers negative reactions to outside stimuli. Emotional development is stunted, and the successful development and utilization of healthy coping skills is restricted.[15] The absence of a positive male figure can negatively impact young males, leading to difficulties with identity formation, emotional regulation, and an increased likelihood of engaging in criminal behaviors.[16] Without male guidance, Mr. Dukes may have struggled to navigate societal expectations of masculinity, leading him to seek validation through other avenues, such as his involvement in the music industry, where themes of criminality and street life are often glorified.

Despite the negative influences of his upbringing, Mr. Dukes has found success as a rapper, which suggests a high degree of resilience and personal ambition. His success may have acted as a protective factor, providing him with a legitimate outlet for self-expression, financial stability, and social recognition. However, the music industry, particularly in certain genres, often intersects with themes of violence, criminality, and illegal behavior.[17] This duality of influence means that while Mr. Dukes' career has allowed him to transcend some aspects of his upbringing, it has not

---

[13] Easterbrooks, M.A., Raksin, M., McBrian, S.F. (2014). Father involvement and toddlers' behavior regulation: evidence from a high social risk sample. *Fathering*, 12(1), 71-93.
[14] Flouri, E. & Buchanan, A. (2003). The role of father involvement in children's later mental health. *Journal of Adolescence*, 26, 63-78.
[15] Ibid.
[16] East, P., Delker, E., Blanco, E., Burrows, R., Lozoff, B., & Gahagan, S. (2019). Father absence and early onset of risk behaviors in Latina females. *Journal of Developmental and Behavioral Pediatrics*, 40(2), 115-125.
[17] Sullivan, R. (2003). Rap and race: It's got a nice beat, but what about the message? *Journal of Black Studies*, 33(5), 605-622.

fully insulated him from the negative patterns established by his community peers and family. His continued legal issues suggest that the themes of criminality in his career and personal life remain intertwined.

Mr. Dukes' involvement in the criminal justice system can be understood in the context of his familial background, the absence of male role models, and the normalization of criminal behavior within his environment. While his success in the music industry has demonstrated resilience, the lingering effects of his upbringing continue to influence his behavior. As an adult, Mr. Dukes is now the father to three children who are all at risk of psychological, social, and emotional decline, should he be sentenced to an extended period of incarceration. In addition to the tangible physical loss of a parent, via incarceration, children of incarcerated parents also suffer losses that impact communication, health, mental health, social engagement, and overall development. Incarceration removes individuals from their families and communities, increasing the potential for disrupted relationships, community fragmentation, and additional burden on service systems.

The collateral damage of parental incarceration on children includes negative outcomes such as poor educational attainment, the strain of economic deprivation, family disruption and instability, and the exacerbating of any attachment related stressors that existed prior to the incarceration.[18] Children separated from a parent due to incarceration can be expected to demonstrate significant maladaptive behavior patterns if safe attachments are interrupted during key developmental periods.

---

[18] DeHart, D., Shapiro, C., & Clone, S. (2018). "The pill line is longer than the chow line": The impact of incarceration on prisoners and their families. The Prison Journal, 98(2), 188-212.

**RECOMMENDATIONS**

Exposure to trauma and adversity is a pervasive reality and exposure to community violence as well as inability to form a healthy attachment with a father instill a deep and lasting mistrust and hypervigilance in relationships, and profoundly alter a person's view of themselves, the world, and their place in it. It is critical to view Mr. Dukes' developmental history through the lens of early adversity, with the belief that individuals are shaped by their relationships and environment. When those relationships have been fraught with chronic adversity, it can alter the course of healthy human development in significant ways. Emotions, self-worth, behaviors, and overall functioning can be deeply impacted, and relationships, schooling, and occupation may suffer, all of which are applicable to the developmental trajectory of Mr. Dukes. As a result, goals and dreams and overall life path can be derailed. Many of the symptoms that Mr. Dukes has experienced and displayed have actually served as necessary adaptations he has made in order to survive, which demonstrates his resiliency and his capacity to survive and persevere despite seemingly overwhelming obstacles.

Mr. Dukes has not only flourished professionally, given his struggles, he has also found time to contribute to his community. Letters appended herein depict a selfless individual who has donated clothes and food to the homeless. Dexter Dale of Starlink Entertainment states that he also participated in toy drives and even worked with the Chicago Mayor's office in organizing youth outreach programs. Mr. Dukes is also an "avid supporter and participant in a number of community events specifically focused on deterring violence, such as local Books Over Bullets charitable events.

Taking a strengths-based approach, and to ensure minimal risk for recidivism and produce a productive member of society, it is imperative to recognize the developmental trajectory of Mr.

Dukes, developmental challenges and emotional consequences, and his success in the music industry despite facing societal challenges and lacking male role models, support, and guidance during childhood and adolescence. Therefore, we are respectfully asking the Court to consider the existing mitigating factors and success in the community as a musician, and sentence him to a period of incarceration that is no greater than necessary to punish and promote respect for the law.

Mr. Dukes has plans upon release to immediately relocate to Los Angeles, California, where he will resume his music career with his manager and label, Warner Records. Mr. Dukes has been signed for three albums, with two already completed. Mr. Dukes will travel with his girlfriend and children and benefit from family and community support (schools for the children have already been researched and transcripts have been provided to Mr. Dukes' attorney), where he also maintains his music network and industry connections. Additionally, addressing the intergenerational trauma and familial normalization of criminality through trauma-informed therapy will help Mr. Dukes develop a healthier relationship with his past and present. If sentenced to further incarceration, it will additionally be critical that he has access to all available programming, to manage symptoms of mental distress, gain clarity and insight into patterns of behavior, learn additional skills that will serve him in a productive manner upon release, and prepare for successful reintegration. Upon release, Mr. Dukes could benefit from support in navigating the duality of his career success and the negative influences from his past. Career counseling and mentorship from industry professionals who have successfully avoided legal issues may help him maintain a positive trajectory.

We do not intend on negating the behavior that led to his arrest, but respectfully request that the Court and United States Attorney's Office consider the contents of this presentence memorandum. Concurrence with our recommendation will provide him access to a myriad of

services that will enhance his quality of life and access to further develop skills needed for success and productivity, which will, with confidence, afford him the most successful prognosis to lead a productive, responsible, and law-abiding life upon release.

The Consulting Project would like to thank the Court for its review and consideration of the contents of this memorandum and are hopeful it will concur with our recommendation.

Respectfully submitted,

Mandi Budah, MA, LCSW
Forensic Social Work Consultant

Reynaldo Cusicanqui, BA
Forensic Mitigation Specialist
CONSULTING PROJECT